WISHCALESS v. HAMMOND, STANDISH & CO.

1. SUICIDE—ACCIDENT—EVIDENCE—PRESUMPTIONS.

   Where a person is found dead under such circumstances that death may have been due to suicide or to accident, the presumption is against suicide and in favor of accident.

2. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDING OF INDUSTRIAL ACCIDENT BOARD—REVIEW.

   On certiorari to review an award by the industrial accident board, under the workmen's compensation act, conclusions

of the board, supported by competent testimony, will not be reviewed by the appellate court.

3. SAME—DEATH—PRESUMPTIONS—BURDEN OF PROOF.
Where an employee engaged in running an elevator met his death in such a way that there was a reasonable inference that it was the result of an accident while he was engaged in his employment, it falls upon the employer, who seeks to evade liability under the workmen's compensation law, to prove the contrary.

4. SAME—EVIDENCE—FINDING OF INDUSTRIAL ACCIDENT BOARD.
Evidence *held*, to support the finding of the board that deceased met with an accident which arose out of and in the course of his employment, causing his death.

Certiorari to Industrial Accident Board.   Submitted January 10, 1918.   (Docket No. 35.)   Decided March 28, 1918.

Mary Wishcaless presented her claim for compensation against Hammond, Standish & Company for the accidental death of her husband in defendant's employ.   From an order awarding compensation, defendant brings certiorari.   Affirmed.

*Beaumont, Smith & Harris,* for appellant.

*Leonard L. Szymanski,* for appellee.

MOORE, J.   This is certiorari to review an order of the industrial accident board on the claim of Mary Wishcaless against Hammond, Standish & Company, for compensation because of the death of her husband. Counsel say:

"The record presents the question whether there was an accident, and if so, whether it arose out of and in the course of Wishcaless' employment by Hammond, Standish & Company.   Liability was denied on these grounds at the time of the arbitration" and is now denied for the same reason.

Frank Wishcaless had been employed for five years

by Hammond, Standish & Company, at its plant at Detroit, and for some months prior to and on August 18, 1916, was operator of freight elevator No. 3. On that day he disappeared. Three days later his body was found in the pit of the shaft of that elevator.

It is argued that deceased did not meet with an accident which arose out of and in the course of his employment. We quote from the brief of counsel:

"Appellant alleges that it is impossible because of the construction of the elevator and the size of deceased, to do more than merely guess how Wishcaless reached his death; that to say, his death arose out of and in the course of his employment by the Hammond, Standish & Company is pure conjecture; that such a guess or conjecture is no more reasonable than other guesses and conjectures, any one of which would bring the happening outside of the scope of the compensation act."

Again we quote from the brief:

"The record in this case is not even strong enough to invoke the rule that compensation should not be allowed when two guesses or conjectures exist, one favorable to applicant and one opposed, both of which are equally strong. All that is known here about what happened to Wishcaless is that he had been operating the elevator some time that morning; that he disappeared; that he could not have fallen through or around the floor of the elevator into the pit; that his body was found, not at his place of employment but twelve feet below the first floor in a pit where he had no business to be and where he would not get from his place of employment because of any incident of that employment, and where he actually could not get unless he deliberately set about or was thrown there. How he got into the shaft and the pit, whether he fell into it, what caused his death, whether he was attending to his duties and suffered an accident, no one has testified. It is wholly unreasonable to say, bearing in mind his duties and his surroundings, that his death was due to any accident which arose out of and in the course of his employment."

Again we quote from the brief:

"It is much more logical to accept the theory of several of the witnesses that he must have forced himself through the eight and a half inch space than it is to adopt those advanced by the board. If he did that, no proof has been submitted that he was in the course of his employment while so doing and that his duties required him to do any work under the elevator platform. Rather, the proofs are that he had no business under the car, and therefore, it cannot be said that the risk was reasonably incidental to his employment. *Bischoff* v. *Foundry Co.*, 190 Mich. 229; *Spooner* v. *Detroit Saturday Night Co.*, 187 Mich. 125."

We again quote from the brief:

"For the sake of argument it might even be admitted that there is sufficient evidence in the record to support a finding that deceased met his death as the result of an accident rather than by suicide, and yet it does not follow that compensation should be awarded. The applicant must further prove that the accident arose out of and in the course of his employment. And supposing it did arise in the course of his employment, there is not an iota of testimony to prove that it arose out of his employment."

It is proper here to consider what is shown by the record. Upon the hearing counsel for appellant stated:

"I can make my line of questioning very material, if your honor please. It may be as well to state now as later that one of the defenses is that the man did not meet his death, as I have already said, through any accident that occurred at our plant; that his death was due to the voluntary act of the man himself."

The deceased had worked for defendant a number of years. His foreman said they had less trouble with the elevator he ran than any of the others. He had a wife and several children. He left home about six o'clock in the morning. There is testimony indicating tnat he was under the influence of liquor early in the

day, but the effect of the liquor apparently passed away later in the morning. About nine o'clock the mechanical superintendent reprimanded him because he was not more attentive to his work. There was testimony indicating that his wife had him arrested about three years before his disappearance. One witness said that, about three weeks before August 18th, when he disappeared, he heard him say he wished he was dead, but all of the witnesses who saw him on the day in question, who spoke upon that subject, said there was nothing in his appearance or talk out of the ordinary or that indicated he was despondent.

There is a conflict in the testimony as to the time when he disappeared. The mechanical superintendent claims that about 10 o'clock he learned there was no operator on the elevator. He learned this from the electrician, who had charge of the elevators, who testified that about 10:30 o'clock he learned the elevator was not running, who after receiving notice that the elevator had no operator, went to it and found it deserted between the fifth and sixth floors. The floor of the elevator was just far enough below the top of the door sill on the fifth floor so that he says he could crawl through the opening and into the elevator, although in doing so, the contents of his pockets were squeezed out. After considerable difficulty he opened the door from the outside with a file. All the doors were closed and locked from within the shaft.

The elevator served five floors, but did not go into the basement, leaving a pit 12 feet deep. There was but one elevator in the shaft. The elevator was lighted by electricity and the lights were burning continually. A diagram was introduced in evidence which showed the floor of the elevator was seven feet ten inches square; that there were seven and a half inches from the floor of the elevator to the east wall of the

shaft, eight inches from the floor of the elevator to the north wall of the shaft, three inches from the floor of the elevator to the south wall, and three and a half inches on the west side. These measurements were taken between the fifth and sixth floors at the place at which the elevator was found. The north and south sides of the elevator were protected by wooden walls six feet high. The other sides were not protected. There are doors on the east and west sides of the shaft on some of the floors, but on the fifth there is only a door on the west side. These doors are solid and double, swinging out. They are locked from the inside of the shaft by the elevator operator by a pine cross bar which is a two-by-four about four feet long. The cross bar is swiveled in the center and swings into receptacles on each end, one end of the bar being heavier than the other. The doors cannot be locked from the outside without going to considerable trouble with a thin file or long knife. The elevator cannot be operated excepting by the controller which is a small handle attached to the top of a circular chamber six or seven inches in diameter, set up on the north wall of the elevator. It is semi-automatic, that is, the moment the operator takes his hand off the controller the elevator stops. In order to move the elevator it is absolutely necessary for the operator to keep his hand on the controller. The record does not disclose that the disappearance of Wishcaless caused any particular wonderment at the time to the mechanical superintendent, or to the electrician. One of them inquired of the other if he had been discharged and the other testified:

"*Q.* When you heard on the morning of the 18th that he was not operating the elevator, what did you think had become of him?

"*A.* Why I simply thought he had quit and gone home, as those fellows usually do when they are dissatisfied, walk out of the plant."

Witnesses gave testimony indicating that the elevator did not stop running as early as the electrician and superintendent had testified it did. Three of the witnesses on the part of the claimant testified they saw and talked with the deceased at from three to five minutes before the noon lunch hour, and that he then entered the elevator, closed the doors and started it. No one saw him alive after this. All of the witnesses for the respondent are substantially agreed that Mr. Wishcaless must have been in the elevator when it stopped, that he did not leave it through the door. One witness for the respondent had a theory that deceased for some reason of his own, after stopping the elevator, attempted to crawl over the six foot wall on the south side to get to a window on that side of the shaft to find a cool spot to rest. It is not explained why he should do this when he could have done it so much easier by stopping at the fifth floor and opening the door. Nor is it explained how, if he did it, he got into the elevator pit.

The serious question in the case is the claim that deceased must have committed suicide. We have already quoted testimony bearing upon that subject, but it is urged and witnesses testified that because of the size of the man, and the narrowness of the opening he could not have got through it without intentionally squeezing himself through. After witnesses expressed themselves to this effect the committee took a recess and went and looked at the elevator and found that the distance between the elevator and the east wall was greater than shown on the diagram which we have before mentioned, and that it was about 8½ inches. They reached the conclusion that deceased passed through this opening to the pit where he was found.

The evidence as to the size of the deceased is not at all conclusive. No one testified as to the girth of the man, no one testified to the chest measure, the waist

measure, or the hip measure. No one testified to having seen the man weighed. Witnesses gave their opinion as to his weight varying from 170 to 190 pounds. One witness in answer to the question, "Was he a man of your size or smaller?" answered, "He was larger than I am and taller. He was not taller but thicker. I am very slender." Another witness, when asked, "Was he a heavy-set man or a light, thin man?" answered, "Well, he was medium."

August 18th was a hot day. The deceased, like other employees, was dressed in white. It may be easily demonstrated at any elevator having a door that may be opened 8½ inches, that a man of even more than medium size, dressed in summer clothes could easily pass through the opening. The record is silent as to whether the elevator was loaded when found, and if so whether the character of the load was such as to require adjustment so that some of it might not slip into this opening.

In 1 Am. & Eng. Enc. Law (2d Ed.), at p. 331, it is said:

"Presumptions—Against Suicide.—Where the insured is found dead under such circumstances that death may have been due to suicide or to accident, the presumption is against suicide and in favor of accident."

There are cited a great many authorities in the note.

In *Travelers' Ins. Co.* v. *Sheppard,* 85 Ga., at page 801, appears the following:

"The plaintiff must make out her case; but in so doing she can use the presumption against suicide which the law recognizes as arising out of the instincts of nature, one of which is the love of life. Where the fact of death is established, and the evidence points equally or indifferently to accident or suicide as the cause of it, the theory of accident rather than suicide is to be adopted. *Cronkhite* v. *Insurance Co.,* 75 Wis. 116 (19 Ins. L. J. 267); *Mallory* v. *Insurance Co.,* 47

N. Y. 52; *Travelers' Ins. Co.* v. *McConkey,* 127 U. S. 661."

In *Walcott* v. *Insurance Co.,* 64 Vt., at p. 228, it is said:

"A person is found dead; the presumption is that his death was natural or accidental. The mere fact of death in an unknown manner creates no legal presumption of suicide or the taking of one's life by his own hand or act. Upon evenly balanced testimony, the law assumes innocence rather than crime. Lawson on Presump. Ev. p. 241; 1 May on Insurance (2d Ed.) § 325; *Mallory* v. *Insurance Co.,* 47 N. Y. 52 (7 Am. Rep. 410); *Cronkhite* v. *Insurance Co.,* 75 Wis. 116 (17 Am. St. Rep. 184); *Freeman* v. *Insurance Co.,* 144 Mass. 572."

In *Connecticut Mut. Life Ins. Co.* v. *Akens,* 150 U. S., at p. 475, it is said:

"And in making out such proof the plaintiff is entitled to the benefit of the presumption that a sane man would not commit suicide, and of other rules of law established for the guidance of courts and juries in the investigation and determination of facts. *Travelers' Ins. Co.* v. *McConkey,* 127 U. S. 661, 667."

In *Travelers' Ins. Co.* v. *McConkey,* 127 U. S., at p. 666, appears the following:

"Were the means by which the insured came to his death also accidental? If he committed suicide, then the law was for the company, because the policy by its terms did not extend to or cover self-destruction, whether the insured was at the time sane or insane. In respect to the issue as to suicide, the court instructed the jury that self-destruction was not to be presumed. In *Mallory* v. *Insurance Co.,* 47 N. Y. 52, 54, which was a suit upon an accident policy, it appeared that the death was caused either by accidental injury or by the suicidal act of the deceased. 'But,' the court properly said, 'the presumption is against the latter. It is contrary to the general conduct of mankind; it shows gross moral turpitude in a sane person.'"

We have often held that, if there was competent testimony upon which the conclusions of the industrial accident board were based, we would not weigh that testimony. Section 5465, 2 Comp. Laws 1915; *Reck* v. *Whittlesberger*, 181 Mich. 463; *Rayner* v. *Furniture Co.*, 180 Mich. 168; *Vogeley* v. *Lumber Co.*, 196 Mich. 516.

In the instant case the deceased was engaged in his usual work of running an elevator. It is found stopped between floors under such circumstances that he must have been in it at the time and did not pass out through the doors. There is no good reason shown why he should climb over the top of the elevator and if he did that would not account for the presence of the body in the pit. If he stepped or fell through the opening the pull of gravity which never ceases its work would take him where he was found.

In *Papinaw* v. *Railway Co.*, 189 Mich. 441, it was said:

"This claim is by a dependent of a workman who was accidentally killed, and whose evidence is therefore not available. In *Grant* v. *Railway Co.*, 1 B. W. C. C. 17, it is said:

"'If in such a case facts are proved the natural and reasonable inference from which is that the accident happened while the deceased was engaged in his employment, I think it falls upon the employer, if he disputes the claim to prove that the contrary was the case.'"

Applying the principles of law above stated to the facts and circumstances shown in this case, we think the inference may be fairly drawn that deceased met with an accident which arose out of and in the course of his employment.

The award is affirmed, with costs.

OSTRANDER, C. J., and BIRD, STEERE, FELLOWS, STONE, and KUHN, JJ., concurred. BROOKE, J., did not sit.