CHAUDIER v. STEARNS & CULVER LUMBER CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—ESTAB-
   LISHING CLAIM—BURDEN OF PROOF.
   The burden of establishing a claim for compensation under
   the workmen's compensation act is upon those seeking
   the award.

2. SAME—SUICIDE—ACCIDENTAL DEATH—PRESUMPTIONS.
   Where claimant's decedent died as the result of alkaline
   poisoning, caused by taking into the stomach a quantity
   of lye and wood ashes, and the inference that they were
   taken with suicidal intent is at least as reasonable as
   that they found entrance to the stomach accidentally,
   claimant may not recover under the workmen's compen-
   sation law as for an accidental injury.

3. SAME—PRESUMPTIONS.
   Where two inferences equally consistent with the facts arise
   out of established facts, one involving liability on the
   part of the employer under the act and the other relieving
   him from liability, the claimant must fail.
   BIRD, C. J., and MOORE and KUHN, JJ., dissenting.

Certiorari to Industrial Accident Board. Submit-
ted April 15, 1919. (Docket No. 41.) Decided July
17, 1919.

Mary Chaudier presented her claim for compensa-
tion against the Stearns & Culver Lumber Company
for the accidental death of her husband in defendant's
employ. From an order awarding compensation, de-
fendant and the Southern Surety Company, insurer,
bring certiorari. Reversed, and order vacated.

*B. H. Halstead,* for appellants.
*Doyle & Barstow,* for appellee.

Certiorari to the industrial accident board. Claim-
ant's decedent, a man 42 years of age, was employed

by respondent Stearns & Culver Lumber Company in its shingle mill where he worked during the week. The lumber company maintained in connection with its business a large steel burner in which was consumed the refuse from the mill. This burner was about 20 feet in diameter and 60 or 70 feet high. There were grates in the burner about level with the ground and underneath the grates an ash pit about 3 or 4 feet deep with a cement floor. It was customary to permit the fire to go out on Saturday or to put it out in order that the ashes might be removed on Saturday night or Sunday. The work of removing the ashes from the burner had been performed by claimant's decedent for many weeks prior to his death. On Saturday, June 30, 1917, he commenced the work of removing the ashes at about 6:30 p. m., and continued until about 1:30 Sunday morning. He then went home and slept until about 8 or 9 o'clock when he resumed his work at the burner. He worked until about 2 o'clock Sunday afternoon, when he returned home, had his dinner, carried some potatoes to the field for his wife and at about 3 o'clock returned to the burner. He returned to his home some time before 6:30 Sunday evening, the exact hour being unknown as his wife was away. When she reached home at 6:30 she testified that he was lying on the bed and felt sick—felt like vomiting; that he seemed to sleep until 10:30 when she woke him up to try and have him undress and go to bed; that he moaned but did not seem to recognize her; that he was in a sort of stupor from then until 12 o'clock, at which time he got up and started to walk about the room seeming to be in pain. This lasted for about an hour during which time he fell to the floor. Claimant went for a doctor for him at 1 o'clock in the morning but was unable to secure medical attendance at that time. She did, however, secure a doctor at about 6 o'clock in the

morning. Claimant testified that when she first saw her husband at 6:30 he seemed to be in a drunken state,—

"I naturally thought when I came home at 6:30 and he was asleep, that during the afternoon he had met friends at the mill who had given him liquor."

The doctor upon examining him found no temperature and concluded that he was suffering from some stomach trouble. He administered an emetic and later washed his stomach out six times with about a quart of water each time. He found the stomach full of an alkali and about a teacupful of ashes. Upon further examination the doctor testified:

"*Q.* That would kill a man if he got it in his stomach?

"*A.* Yes, sir.

"*Q.* In your judgment, he died from that?

"*A.* Yes, sir.

"*Q.* How did he get it in his stomach?

"*A.* He might have had a pail of water and a good deal of ashes fell in, and in a thirsty condition he might have drunk that water.

"*Q.* The stuff that you pumped out of his stomach was an alkaline poison derived from wood ashes?

"*A.* Yes.

"*Q.* Now, I suppose you are enough of a chemist to be able to say that the stuff that you found in using your stomach pump was a derivative of wood ashes, and in your judgment, was in sufficient quantities to cause his death?

"*A.* Yes.

"*Q.* Now, suppose a man had a pail of water to drink from, and some of those ashes had gotten into the water and he had not noticed it, and had drunk the water, would he have drunk enough water to kill him?

"*A.* By drinking enough.

"*Q.* I take it that stuff he had in his stomach was lye. You take leached ashes would make lye. That would kill a man?

"*A.* Yes, sir.

"*Q.* Suppose a man was working in those ashes, doctor, and got quite a lot of ashes in his mouth, in his nose and mouth and he naturally would if he were working in a lot of it—suppose he drank copiously of water—don't you suppose he could drink enough water to create lye in his stomach?

"*A.* I don't think of it that way.

"*Q.* How do you figure it got in?

"*A.* I can't tell. It got in in some way."

And on cross-examination he testified in part:

"*Q.* Ordinarily a man doesn't swallow any substance unless he wills it?

"*A.* Ordinarily, no.

"*Q.* Then the natural impulse, if a man gets something into his mouth that doesn't have a pleasant taste, the natural impulse is to spit it out?

"*A.* Yes, sir.   *   *   *

"*Q.* Do you think, doctor, that a man could swallow dry wood ashes alone?

"*A.* I don't know — I couldn't tell. I imagine it would require an effort; a considerable effort.

"*Q.* Something like swallowing flour?

"*A.* Not as hard.

"*Q.* The tendency to swallow dry ashes would be to choke?

"*A.* Yes, sir.   *   *   *

"*Q.* Then isn't this a fair conclusion; that if a man got dry ashes into his stomach it would be through a positive effort of the will, and against the reactions of nature?

"*A.* That would be my impression.

"*Q.* Could only be gotten into his stomach by voluntary action on the part of the man?

"*A.* I think so.

"*Q.* And in spite of the efforts of nature to prevent them going down his throat?

"*A.* Yes, sir.

"*Q.* Do you suppose a man could swallow wood ashes at all without moistening them in some way?

"*A.* I really don't know.

"*Q.* I suppose by the natural moistening that they would receive from the saliva?

"*A.* I suppose so.

"*Q.* How large a quantity did you find in this man's stomach?

"*A.* Of course, as I told you before, I couldn't say the quantity, and I didn't make a chemical analysis.

"*Q.* What is your best judgment on it?

"*A.* That is very hard to tell. I washed him out six times and four times I got alkali; the first stronger than the second; the second stronger than the third; and the third stronger than the fourth.

"*Q.* But I understand that you found ashes?

"*A.* Yes, I suppose as much as an ordinary tea cup?

"*Q.* Were there enough ashes to produce alkali?

"*A.* It seems strange that there was more alkali than ashes. There was some discrepancy there.

"*Q.* You don't know how these ashes got into his stomach?

"*A.* No, sir.

"*Q.* Is it your judgment that the amount of alkali that you found there must have been generated outside of his stomach?

"*A.* I don't want to form a real opinion of that.

"*Q.* Think you said that the amount of ashes you found in his stomach was not sufficient to form alkali? That was the condition of his throat?

"*A.* Well, his mouth and throat we didn't examine very much for this reason, that he was unconscious, and dying, and I didn't expect him to live as long as he did and we didn't examine.

"*Q.* Did you notice any indications in mouth or throat that an alkaline substance had come in contact with those tissues?

"*A.* It would take a much stronger alkali to affect those tissues than to affect the lining of the stomach.

"*Q.* You said something, you and Mrs. Chaudier, about him taking some poison from liquor?

"*A.* We had some talk about whisky. He had been using some whisky and Mrs. Chaudier brought me a bottle, and I was going to examine the bottle.

"*Q.* What bottle?

"*A.* The whisky bottle.

"*Q.* He had been drinking that day?

"*A.* I think I was told so.

"*Q.* By Mrs. Chaudier?

"*A.* We thought so, both of us.

"*Q.* Was there some left in the bottle?

"*A.* About a tablespoonful.

"*Q.* Do you know from your examination whether he had been drinking liquor?

"*A.* No, I couldn't tell either way.

"*Q.* The other condition was so much more pronounced, that you couldn't say?

"*A.* Yes, sir.

"*Q.* What did Mrs. Chaudier say?

"*A.* Well, she thought he had been drinking some that day.

"*Q.* And showed you the bottle?

"*A.* Yes, sir.

"*Q.* You said, I think, doctor, that this man's death might possibly be accounted for by his having drank water from a pail into which ashes had been accumulating. You think that might be?

"*A.* I think so. He might have brought some water with him and set it in a corner. I can't conceive of it in any other way.

"*Q.* How many swallows of liquid would it require to get into this man's stomach the amount of alkaline substance that you found there?

"*A.* How many swallows?

"*Q.* Yes.

"*A.* Well, a dozen large swallows of that stuff would account for it.

"*Q.* One swallow wouldn't account for it?

"*A.* No.

"*Q.* You don't know where the drinking supply was down there?

"*A.* No, sir.

"*Q.* What sort of a taste would an alkaline substance such as this have? How would it taste if a man put it in his mouth?

"*A.* It would taste a little burning.

"*Q.* Not like ordinary water?

"*A.* No, sir.

"*Q.* A man taking that would know he had something other than ordinary water?

"*A.* Yes, sir; it would burn and taste nasty."

Claimant's decedent died at about 3 o'clock Monday afternoon. One William Sterk, another employee

of the respondent lumber company, testified that he had cleaned the ashes out of the burner about 25 times; that he usually took a jug of water with him from which he would frequently drink. He said that in drawing out the ashes he would get some in his nostrils and mouth but that it did not bother him. There was a tank about 60 or 70 feet from the burner in which there was running water all the time. Sterk testified that some of the men brought water to the mill in pails and some in jugs. The record does not disclose that claimant had a pail with him containing water on the night in question. The board, on appeal from an award by the arbitration committee, after reciting much of the testimony said:

"It seems very clear that in some way the man got a lot of ashes into his stomach. Whether a lot of ashes fell into a pail of water and became dissolved and the substance was drunk by the deceased, or whether he got quantities of ashes into his mouth and nose and then drank quantities of water and washed the ashes down does not appear, but it seems very clear that the ashes got into his stomach in one of these ways. It is, of course, possible that the man might have deliberately put ashes into water and drank the substance and thus committed suicide, but there is no proof to that effect. The presumption of the law is against suicide in this kind of a case, and in favor of the theory of accident. We are impelled to hold that this man did suffer an accidental, personal injury in being accidentally poisoned by the ashes he was handling, and that said accidental, personal injury arose out of and in the course of his employment with the employer, and that said accidental, personal injury was the proximate cause of his death."

Counsel for respondents claim that the facts proven are not capable of supporting either of the theories advanced by the board; that there is no proof whatever tending to show that claimant's decedent came to his death through any accidental, personal injury received out of and in the course of his employment;

that the manner in which decedent came to his death was a matter of pure conjecture and that the facts proven are as consistent with nonliability of respondents as with liability. It is claimed further that the only conclusion that can legitimately be drawn from the evidence is that the man committed suicide or was drunk.

BROOKE, J. (*after stating the facts*). The facts upon which the industrial accident board based its conclusion that claimant's decedent died from the effects of an accidental, personal injury arising out of and in the course of his employment are extremely meager. They may be briefly summarized as follows:

(1) During the 23 hours preceding his death decedent had been engaged at intervals in cleaning out wood ashes from the burner.

(2) At 6:30 in the evening he was found by claimant lying upon his bed fully clothed in a comatose condition which continued until 6 o'clock the next morning with the exception of about an hour at midnight when he walked about the room being apparently in great distress.

(3) The physician called to attend him at 6:30 in the morning with the aid of a stomach pump removed from the stomach of the decedent a large quantity of alkaline liquid and about a teacupful of wood ashes.

(4) Decedent died from alkaline poisoning attributable to the presence in the stomach of lye and ashes.

The following conclusions would seem to be warranted by the record: Plaintiff's decedent did not die as the result of an occupational disease; in other words, the lye and ashes found in his stomach did not get there through the performance of his work in the ordinary way. This fact seems to be made clear by the testimony of the witness, Sterk, who himself had removed the ashes from the burner at least 25 times. It is likewise to be noted that the work was done but once each week so that the deleterious effect of the

ashes taken into the stomach in the ordinary course of the employment, if any, could scarcely be said to be cumulative from period to period.

There is no evidence tending to show that on the night in question plaintiff's decedent had with him a pail of water into which large quantities of ashes might have fallen in the course of the work. There is no evidence that decedent drank from a pail of water heavily impregnated with ashes. There is evidence of the physician to the effect that the liquid taken from the man's stomach would be: "A little burning," that: "It would burn and taste nasty," and that:

"To swallow something that hasn't a pleasant taste involves an effort of the will."

Counsel for claimant assert that the foregoing facts are sufficient to support the inference indulged in by the board to the effect that decedent swallowed the ashes and alkaline liquid accidentally. They point out that, it being undisputed the lye and ashes were in the stomach and caused his death, the only possible inferences are:

(1) That they were taken into the stomach by the decedent accidentally, or

(2) That they were so taken wilfully and with suicidal intent and they rest upon the presumption against suicide, citing *Wishcaless* v. *Hammond, Standish & Co.*, 201 Mich. 192.

This position is met by counsel for appellant with the argument that the presumption arises only where the facts and the logical deductions therefrom point with equal cogency to suicide or accidental death and that in the case at bar the accidental theory is negatived by the testimony of the doctor that the substance found in the stomach of the decedent could not have been taken by decedent without a conscious effort because of its unpleasant taste. The rule to be adopted by the board is set out clearly in the case of *Ginsberg*

v. *Adding Machine Co.*, 204 Mich. 130, in the following language:

"It is the province of the board to draw the legitimate inferences from the established facts and to weigh the probabilities from such established facts. *Wilson* v. *Phœnix Furniture Co.*, 201 Mich. 531. But the inferences drawn must be from established facts; inference may not be built upon inference, possibilities upon possibilities, or inferences drawn contrary to the established facts, contrary to the undisputed evidence. If an inference favorable to the applicant can only be arrived at by conjecture or speculation the applicant may not recover. So if there are two or more inferences equally consistent with the facts, arising out of the established facts, the applicant must fail"—citing many cases.

Applying that rule to the facts in the case at bar and in further consideration of the rule which places the burden of establishing the claim for compensation on those seeking the award, we are constrained to the view that the inference that the liquid and ashes found in decedent's stomach and which caused his death were taken into the system by the decedent with suicidal intent, is at least as reasonable as that they found entrance to the stomach accidentally, and where two inferences equally consistent with the facts arise out of established facts, one involving liability on the part of the employer under the act and the other relieving him from liability, the applicant must fail.

The award must be vacated.

OSTRANDER, STEERE, FELLOWS, and STONE, JJ., concurred with BROOKE, J.

MOORE, J. (*dissenting*). I do not agree with the conclusion reached by Justice BROOKE. In *Wishcaless* v. *Hammond, Standish & Co.*, 201 Mich. 199, there is a collation of authorities to the effect that the presumption is against suicide. We have often held that if there is competent testimony upon which to base

the award we would not disturb it. Section 5465, 2 Comp. Laws 1915; *Vogeley* v. *Lumber Co.*, 196 Mich. 516, and cases cited therein.

When we consider the circumstances under which Mr. Chaudier did his work, his conduct at his home, and the condition found by the doctor, in connection with the presumption against suicide, we think there is testimony to justify the award, and that it should be affirmed, with costs to claimant.

BIRD, C. J., and KUHN, J., concurred with MOORE J.