CROMIE v. FLOREZ, INCORPORATED.

1. Workmen's Compensation—Burden of Proof.

The burden of proving a right to compensation is on the party asserting that right.

2. Same—Department of Labor and Industry—Guess.

In awarding compensation to a plaintiff, the department of labor and industry may not indulge in the assumption of a mere possibility in the nature of a guess as to whether plaintiff is entitled to compensation.

3. Same—Act Not Intended to Provide Certain Kinds of Insurance.

Compensation provided by the workmen's compensation act is not intended to be either sickness, health, or life insurance or to provide benefits for employees suffering from ordinary diseases of life.

4. Same—Second-Injury Fund—Nightwatchman—Injury Arising Out of and In Course of Employment.

Where decedent nightwatchman who left no dependents was found unconscious on a toilet and died without regaining consciousness, whose head was bruised and slightly bleeding and there was some vomit in the immediate vicinity and on a nearby stairway upon which, also, there were skid marks on two or three steps, county medical examiner certified cause of death as "apoplexy. Fractured skull," and his report gave details of fracture and hemorrhage involved, the second-injury fund was not entitled to $1,000 contribution from employer, since there was a failure to prove deceased sustained an accidental injury arising out of and in course of employment (Act No. 10, pt. 2, § 8a, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 245, Pub. Acts 1943).

Appeal from Department of Labor and Industry. Submitted January 9, 1947. (Docket No. 45, Calendar No. 43,562.) Decided April 17, 1947.

Order by Department of Labor and Industry requiring Florez, Incorporated, employer of David J. Cromie, and Hartford Accident & Indemnity Company, insurer, to show cause why they should not pay money into second-injury fund. Award to State Treasurer. Reversed.

' *Eugene F. Black,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Daniel J. O'Hara,* Assistant Attorney General, for the State Treasurer.

*Knight, Snider & Feikens,* for defendants.

BUTZEL, J. This is an appeal by the employer and the insurer from an award of $1,000 to the State treasury for the benefit of the second-injury fund made by the compensation commission of the department of labor and industry in accordance with the provisions of the workmen's compensation law. See Act No. 10, pt. 2, § 8a, Pub. Acts 1912 (1st Ex. Sess.), as added by Act No. 245, Pub. Acts 1943 (Comp. Laws Supp. 1945, § 8424–1, Stat. Ann. 1946 Cum. Supp. § 17.158[1]).

David J. Cromie, deceased, who left no dependents, was employed as a night watchman by defendant Florez, Inc., a photographic studio located in Detroit. He was 68 years of age and is described as having been short of stature and rather heavy. His work hours were from 5 p.m. to 12:30 a.m. On the morning of November 9, 1945, one Peter Sachs, a maintenance worker, on opening the studio, found the lights on in the lobby of the building, the time-clock light on and the door key on the inside of the door in the lock—all of which indicated to him that something was amiss. The passenger elevator was not at its usual station on the main floor. Sachs walked up the rear stairs, looking on each floor; and

on the fifth floor he came upon Cromie seated on the toilet in the ladies' rest room in an unconscious state. Sachs spoke to the sick man and attempted to revive him. Cromie raised his head but was unable to speak, nor was he able to stand when Sachs tried to help him from the seat. Sachs noted that there was a bruise on the back of Cromie's head which was bleeding slightly and that there was vomit in the toilet bowl and on the lavatory. The unconscious man was removed on a cot to the first floor where he remained until he was taken by ambulance to Receiving Hospital where he died later that day without regaining consciousness.

Sachs testified that he discovered some more vomit on the steps just below the landing between the fourth and fifth floors. There are six steps leading from the fourth floor to the intermediate landing and six more steps leading from the landing to the fifth floor. Further investigation revealed skid marks on the last two or three steps leading from the fifth floor to this landing. The marks were about one and one-half inches from the edge of the tread and were described by the witness as: "Just like you take an eraser and erase." There was no blood on the stairs. There were no signs of breaking and entering, nor was any money missing from the building. The deceased was found to have $62 in a wallet on his person.

An autopsy was performed on November 10, 1945, by Dr. A. M. Altshuler, Wayne county medical examiner. The medical examiner's report showed that the deceased suffered an abrasion in the occipital region, extensive contusion in the lower lumbar and sacral region, a 3½-inch long linear fracture of the skull extending from the major foramen about $\frac{1}{16}$ of an inch to the left of the middle bone with the right hemisphere displaced and a pontine

hemorrhage indicated.   Dr. Altshuler certified that in his opinion the ''cause of death was apoplexy. Fractured skull.''

Dr. Lyons was qualified as an expert witness and testified for the defendants at the hearing.   He stated that he had performed over 600 autopsies during his medical career; that he was present at the autopsy and observed a gross hemorrhage into the right hemisphere and a clot filling the ventricle of the brain, also a gross hemorrhage into the pons; and that the ventricle and the pons are, either one of them, ''the favorite site of cerebrovascular accident,'' where 90 cer cent. of the cases of apoplexy occur.   He stated that: ''we believed that this man had had a brain hemorrhage; that he had lost consciousness; had fallen against a hard object and fractured the back of his skull, and that it was a cerebral hemorrhage that was the cause of his death because that preceded the skull fracture.''   Dr. Lyons further testified as follows:

''Q.   How do you know,—or, why do you say, Dr. Lyons, that the apoplexy preceded in time the fracture?

''A.   Because a blow in that region would not have caused that type of hemorrhage, Mr. Robbins.

''Q.   A fracture such as you found, a blow that produced that fracture could not have produced that hemorrhage?

''A.   That's right.   It would take a contrecoup coming from an entirely different direction to produce the hemorrhage that we found.   It would have taken a direct blow, either on the back of the head,— not exactly on the vertex, but between the vertex and the occipital, which doesn't produce either a pontine or a ventricular hemorrhage.   *   *   *

''Q.   This pontine hemorrhage, would that affect one's equilibrium?

"*A.* Yes, that is the area in which a number of important factors are controlled.  *  *  *

"*Q.* Is this hemorrhage which you claim as the cause of death, was that traumatic in origin from your findings?

"*A.* No. That was from what we could call natural causes.  *  *  *

"*Q.* Isn't a fracture of the skull evidence of the fall?

"*A.* Yes, but as I say—I tried to point out,—a fracture in this region of the skull would not produce the hemorrhage where the hemorrhage was found."

Dr. Charles H. Clifford, a traumatic surgery specialist, testified on behalf of the department of labor and industry. He had never seen the deceased, had not been present at the autopsy, and stated that he had never performed an autopsy. It was his opinion that there was no method of determining with absolute certainty that the hemorrhage had preceded the fracture or vice versa. Dr. Clifford stated:

"I think that you have, you can have an apoplexy with or without trauma, and I don't think that you can tell which preceded which, and, from a strictly medical standpoint, that your cause of death was hemorrhage—intercranial; and as to whether the apoplexy occurred first or the fractured skull occurred first, it is a matter of inference from the lay testimony and not from a medical standpoint. That is—but I can't conceive, in any medical way, of being able to prove which hemorrhage occurred first. If it were a young individual, it would be a different matter, but this man is, as you stated, a heavy, stocky individual, who undoubtedly has pathology in his arteries. Whether he had the apoplexy, fell, and fractured his skull, or whether he had the fractured skull and then had the hemorrhage, is a legal matter,

and I don't believe it could be proved either way, medically. At least, I can't prove it, and I have seen both occur. I have seen trauma without a fracture cause cerebral hemorrhage. If you have a trauma sufficiently to cause a fracture, you will have more severe trauma than that which would not produce a fracture, so that you can have hemorrhage from vessels inside the brain with minor injury or major injury. You also can have hemorrhage, a massive cerebral hemorrhage, without trauma.''

The deputy commissioner who heard the testimony found that the deceased received a personal injury arising out of and in the course of his employment, and that such injury was the cause of his death. The deceased having left no dependents, defendants were ordered to pay into the State treasury the sum of $1,000 for the benefit of the second-injury fund in accordance with the requirements of the workmen's compensation law. On appeal, the compensation commission of the department of labor and industry entered an order affirming the award of the deputy commissioner, having found that:

''The marks indicating slipping on the stairway between the fourth and fifth floors and the fact that he was found by the maintenance man, Sachs, in the rest room of the fifth floor are significant, we think, and justify a reasonable inference that the fractured skull as reported by the coroner was accidental and preceded the apoplexy.''

In the recent case of *Riley* v. *Kohlenberg,* 316 Mich. 144, we vacated an award in an almost identical fact situation. In that case the question was whether the deceased had suffered a heart attack as the result of which he fell or vice versa. Justice NORTH, writing for this Court, stated:

''In deciding such controversies it seems imperative that three principles be kept in mind. (1) The

burden of proving a right to compensation is on the party asserting that right. *Pucilowski* v. *Packard Motor Car Co.*, 278 Mich. 240; *Veek* v. *Wesley Freight Co.*, 306 Mich. 485. (2) In awarding compensation to a plaintiff, the department may not indulge in the assumption of a mere possibility in the nature of a guess as to whether plaintiff is entitled to compensation. *Ginsberg* v. *Burroughs Adding Machine Co.*, 204 Mich. 130, 137; *Marman* v. *Detroit Edison Co.*, 268 Mich. 166. (3) Workmen's compensation provided by the act is not intended to be either sickness, health, or life insurance or to provide benefits for employees suffering from ordinary diseases of life. *Rector* v. *Ragnar-Benson, Inc.*, 313 Mich. 277; Act No. 10, pt. 7, § 1, Pub. Acts 1912 (1st Ex. Sess.), as added by Act No. 61, Pub. Acts 1937, and amended by Act No. 245, Pub. Acts 1943 (Comp. Laws Supp. 1945, § 8485–1, Stat. Ann. 1946 Cum. Supp. § 17.220)."

Also, see *Ginsberg* v. *Burroughs Adding Machine Co.*, 204 Mich. 130; *Chaudier* v. *Stearns & Culver Lumber Co.*, 206 Mich. 433 (5 A. L. R. 1673). Cases cited by attorneys for the *second-injury fund* present different factual bases and are readily distinguishable.

Upon the record in this case, it cannot be said that the claimant has proved that deceased sustained an accidental injury arising out of and in the course of his employment.

The award of $1,000 to the State treasury for the benefit of the second-injury fund is vacated. No costs on this appeal.

CARR, C. J., and BUSHNELL, SHARPE, BOYLES, REID, NORTH, and DETHMERS, JJ., concurred.