WILTSE v. BORDEN'S FARM PRODUCTS COMPANY
OF MICHIGAN.

1. WORKMEN'S COMPENSATION—BURDEN OF PROOF.
   The burden of proving a right to workmen's compensation is
   on the party asserting that right.

2. SAME—RIGHT TO COMPENSATION NOT BASED ON A GUESS.
   The workmen's compensation commission may not indulge in
   the assumption of a mere possibility in the nature of a guess
   as to whether plaintiff is entitled to workmen's compensation.

3. SAME—INSURANCE—ORDINARY DISEASES OF LIFE.
   Workmen's compensation is not intended to be either sickness,
   health, or life insurance or to provide benefits for employees
   suffering from the ordinary diseases of life.

4. SAME—PROXIMATE CAUSE—SPECULATION.
   An applicant for workmen's compensation must fail either
   if an inference favorable to him can only be arrived at by
   conjecture or speculation or if there are 2 or more infer-
   ences equally consistent with the facts, arising out of the
   established facts.

5. SAME—CREAMERY WORKER—RUPTURED NUCLEUS PULPOSUS—PROX-
   IMATE CAUSE—EVIDENCE.
   Worker in creamery who suffered a ruptured nucleus pulposus
   but who was unable to prove that such condition resulted
   from his work of dumping 10-gallon milk cans rather than

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4, 5] 58 Am Jur, Workmen's Compensation, § 433.
[3] 58 Am Jur, Workmen's Compensation, §§ 4, 209.

from bowling, a fall or other causes disassociated from his work, *held,* not entitled to workmen's compensation or doctors' and hospital charges since he failed to sustain his burden of proof that his impaired physical condition arose out of and in the course of his employment.

Appeal from Workmen's Compensation Commission. Submitted June 8, 1950. (Docket No. 42, Calendar No. 44,593.)   Decided September 11, 1950.

Application by defendant Borden's Farm Products Company of Michigan for determination of rights relating to claim of Raymond A. Wiltse. Award to plaintiff. Defendant appeals. Reversed.

*Alexander, Cholette, Buchanan, Perkins & Conklin,* for defendant.

NORTH, J.  Plaintiff, an employee of the defendant company, received an award of compensation for a personal injury claimed to have arisen out of and in the course of his employment, and for doctors' and hospital charges.  Defendant has appealed.

Prior to the hearing of this case by the commissioner in September, 1948, plaintiff had been in defendant's employ for approximately 18 years. His testimony as to the character of his work is as follows:

"Well, it is dumping milk. Milk comes in from the farmers on trucks in 10-gallon cans and I have to dump those in the weigh vat and weigh the container and the milk goes from there into the other storage tanks."

The cans of milk weighed approximately 110 pounds.  However, in 1941, a conveyer was installed in defendant's plant and as a result the work incident to the cans of milk required practically no lifting.  Plaintiff testified he did not "have any back

trouble then." But there were cans of cream, about 100 per day, which plaintiff in the course of his duty had to lift. This phase of plaintiff's work continued until August or September, 1947, at which time the matter of separating the cream from the milk was discontinued at defendant's plant, and plaintiff's duties incident to lifting cans of cream ceased. At the hearing in September, 1948, plaintiff gave the following testimony:

"*Q.* When did you first start having difficulty with your back?

"*A.* I don't know definitely, but 3 or 4 years ago when I first noticed it getting bad.

"*Q.* Did you ever have any accident or injury to your back?

"*A.* Not that I know of, outside of a couple of falls, but I didn't know at the time they hurt my back, because I didn't have any pain from it.

"*Q.* Do you remember when you had those falls?

"*A.* I can't remember when, no.

"*Q.* You say you had first noticed something wrong with your back about 3 years ago. Will you tell the deputy commissioner what that was, what you felt, the occasion of feeling it, et cetera.

"*A.* Just a soreness through the back, and stiffness. I couldn't bend over very well without bending my legs.   *   *   *

"*Q.* Did you go to the doctor at that time?

"*A.* No.

"*Q.* Did you lose any time from work?

"*A.* No.

"*Q.* Do you have any idea when the pain started or how it started?

"*A.* No.   *   *   *

"*Q.* Now, have you had an operation on your back recently?

"*A.* Yes.

"*Q.* When were you off work with this back trouble?

"*A.* Sometime in May (1948).  *  *  *  I just—
the pain was bad, so bad I couldn't work and I laid
off, took a couple of weeks off and then I went to
Detroit and took heat treatments and just laid
around loafing, the pain went out of my back at the
time, but it didn't leave my hip and leg.

"*Q.* Will you tell the deputy commissioner how
that started or when it started?

"*A.* It just started is all, I don't know what caused
it or nothing.

"*Q.* Do you know what you were doing when you
first noticed it?

"*A.* No, just came on.

"*Q.* Did you have any accident, or any straining
or anything, you know of.

"*A.* Nothing but regular duties.

"*Q.* Your work at that time was working on a con-
veyor where they didn't have that lifting to do?

"*A.* Yes.  *  *  *

"*Q.* Have you been back to work at all since (May,
1948)?

"*A.* Yes, I went back to work, and worked about
5 weeks."

Plaintiff testified that a statement signed by him
July 1, 1948, was true, and in that statement there
is the following:

"*Q.* How do you account for the pain in your back
starting about 3 years ago?

"*A.* I don't know.  I haven't any idea what caused
it."

This statement also contained the following:

"*Q.* Do you engage in any sports?

"*A.* Bowling—I bowl on Borden's team every year.
We tied for first place at the Borden tournament
in Detroit this spring.

"*Q.* Ever have a pain in your back bowling?

"*A.* No, I've been tired some nights and didn't feel
like bowling, but I bowled.

"*Q.* Haven't you noticed some discomfort in your back while bowling during some game these past 3 years?

"*A.* No, I've noticed it in my right leg, but not my back. I've had a backache when I went up to bowl but it didn't seem any different whether I bowled or not.

"*Q.* When did you first notice pain in your leg while bowling?

"*A.* Ever since I've had this trouble. About the last 3 years. The back pain and the leg pain both started in gradually at the same time. Here lately my back seems better and my leg seems worse."

Referring to plaintiff's impaired physical condition, he was asked: "*Q.* Will you tell the deputy commissioner how that started or when it started?" He answered: "It just started is all, I don't know what caused it or nothing.  *  *  *  *Q.* How do you account for the pain in your back starting about 3 years ago?  *A.* I don't know. I haven't any idea what caused it." Plaintiff also testified:

"*Q.* Did the leg bother you any when bowling?
"*A.* No.
"*Q.* Did bowling seem to affect it in anyway?
"*A.* No.
"*Q.* Does it bother you in the home, in getting in and out of bed or changing position?
"*A.* No.
"*Q.* As far as you know this difficulty just came on? You didn't assist with any strain or accident?
"*A.* There must have been something cause it. I don't know what it was. It was a ruptured disc, that is what it was. It must have been a strain or fall or something started it.  *  *  *
"*Q.* During all that time did you have any talk at all with anybody in the plant about your back or about the way you felt?
"*A.* No.

"*Q.* You never asked for any relief from any of the jobs you were doing?

"*A.* No.

"*Q.* Then, when you did get off in May (1948), did you give them any reason then for taking the time off?

"*A.* No, just the reason of lame back, was all, and my legs ached.

"*Q.* Was it unusual for the fellows around the plant to have lame backs?

"*A.* I don't think so, there is 3 of them off with it now."

On August 12, 1948, plaintiff was operated on by Dr. Schreiber, a specialist in neurosurgery. In this proceeding the doctor by deposition testified:

"*Q.* (After propounding a lengthy hypothetical question to which no objection was made and which we deem it unnecessary to quote) Assuming those facts to be true, doctor, do you have an opinion as to what could be the cause of this ruptured nucleus pulposus or intervertebral disc?

"*A.* The usual cause is a strain which puts excessive strain on the posterior ligament and allows the nucleus pulposus to extrude itself. Of course, I cannot tell when that happened, from this history.

"*Q.* Well, could it result from lifting milk cans?

"*A.* Yes.

"*Q.* Could it result from a fall landing on his back?

"*A.* Yes, sir.

"*Q.* Would the onset of the symptoms make any difference? * * * The time relationship between the fall and the onset of the symptoms?

"*A.* No, although there usually is a relationship. The history as given suggests a recurrence of symptoms over a number of years, with a sudden disabling extrusion, lasting about 3 months; and I would say that the disability that he has, or what brought him to surgery was something that happened some 3 months previous to my seeing him.

"*Q.* Could it be a minor trauma?

"*A.* Any minor trauma could do it.

"*Q.* Stepping off a curb or getting out of bed, **or** slipping of any kind?

"*A.* Yes, sir.

"*Q.* Could result from a lift of any kind?

"*A.* Yes, sir.

"*Q.* Could result from bowling?

"*A.* Yes, sir.

"*Q.* Is it a common injury in bowling, doctor?

"*A.* We have had, I recall, 2 out of 500 that occurred from bowling; at least, that is when the disabling symptoms started, after a bowling game.

"*Q.* Is there any way, with the history that I have given you, that it could be determined as to when this injury occurred?

"*A.* No, sir.

"*Q.* Is one inference as good as another?

"*A.* Inference? What do you mean?

"*Q.* Well, I mean it could have happened any time over the period that the symptoms persisted?

"*A.* Yes, sir.

"*Q.* Any one of the incidents that I mentioned might have caused it or might have aggravated it?

"*A.* Yes, sir."

At the time of taking his deposition Dr. Schreiber made a physical examination of plaintiff, and thereafter gave the following testimony:

"*Q.* Doctor, did you just look over Mr. Wiltse?

"*A.* Yes, sir.

"*Q.* Can you tell us what you find today?

"*A.* * * * From my standpoint he is making a good convalescence, following the removal of the herneated nucleus, but he still shows evidence of some damage to the first sacral nerve which may or may not be permanent; the nerve on operation is [was] found to be somewhat damaged by the pressure on it. * * *

"*Q.* (By Commissioner McAuliffe) Doctor, one thought I had in mind was: In your experience could this man have sustained the injury about which we have been talking some time prior, say, 2 years before the actual disablement occurred?

"*A.* Yes, sir.

"*Q.* In other words, the injury could have been, if I use the correct terminology, minor in character, and then as time went on, it became more extensive until it finally— * * * So that this lifting operation could have been a factor in the original onset of the condition, even 2 years before disability actually ensued?

"*A.* Yes, sir.

"*Q.* The disablement itself, like the acute symptoms, shall we say, on June of 1948, need not necessarily have been precipitated at a time by some specific instance?

"*A.* No, sir. * * *

"*Q.* (By defendant's attorney) Could the injury have been caused by this fall that he said he had in the spring of 1945?

"*A.* Yes, sir.

"*Q.* Without symptoms until some time later?

"*A.* They usually complain of some discomfort at the time, some back pain."

As previously noted the commission awarded compensation to plaintiff. At the outset of its opinion the commission said: "The question before us is whether or not the ruptured disc was due to the plaintiff's employment with the defendant." In passing upon cases of this character, there must be borne in mind the rather definite rules heretofore stated in our decisions in the light of which determination is made as to the right of the applicant to compensation. We note only the following:

"(1) The burden of proving a right to compensation is on the party asserting that right. *Pucilowski* v. *Packard Motor Car Co.,* 278 Mich 240; *Veek* v.

*Wesley Freight Co.,* 306 Mich 485.   (2) In awarding compensation to a plaintiff, the department may not indulge in the assumption of a mere possibility in the nature of a guess as to whether plaintiff is entitled to compensation.  *Ginsberg* v. *Burroughs Adding Machine Co.,* 204 Mich 130, 137; *Marman* v. *Detroit Edison Co.,* 268 Mich 166.   (3) Workmen's compensation provided by the act is not intended to be either sickness, health, or life insurance or to provide benefits for employees suffering from ordinary diseases of life.   (Citing numerous cases.)" *Riley* v. *Kohlenberg,* 316 Mich 144, 148.

" 'If an inference favorable to the applicant can only be arrived at by conjecture or speculation the applicant may not recover.  So if there are two or more inferences equally consistent with the facts, arising out of the established facts, the applicant must fail.' "  *Chaudier* v. *Stearns & Culver Lumber Co.,* 206 Mich 433, 442 (5 ALR 1673), quoting *Ginsberg* v. *Burroughs Adding Machine Co.,* 204 Mich 130, wherein numerous cases are cited.

The rules just above stated have been adhered to and made the basis of decision in recent cases of this Court.  See *Cromie* v. *Florez, Incorporated,* 317 Mich 516; *Trumble* v. *Michigan State Police,* 325 Mich 237; *Daniel* v. *Murray Corp. of America,* 326 Mich 1.

Under this record there can be no question but plaintiff is suffering from an injury or affliction; but except by outright speculation or conjecture it is not possible to fix the fact as to how plaintiff became so afflicted.

Plaintiff, upon being asked: "How do you account for the pain in your back starting about 3 years ago," answered: "I don't know.  I haven't any idea what caused it."   We are mindful that plaintiff also testified: "There must have been something cause it.  I don't know what it was.  It was a ruptured disc, that is what it was.  It must have been a strain or fall or something started it."   But this, instead

of being testimony as to a relevant fact, insofar as it referred to a "ruptured disc," was either hearsay or the expression of an opinion—a conclusion, which plaintiff, as a layman, could not competently give. Further, the quoted testimony has no probative force on the controlling issue as to whether plaintiff's impaired condition arose out of and in the course of his employment.

The only other testimony bearing upon a causal relation between plaintiff's impaired physical condition and his employment was that of Dr. Schreiber. The doctor, after mention had been made of a number of possible causes of plaintiff's condition, some incident to plaintiff's employment and others wholly disassociated from his employment, responded affirmatively to the following question: "Any one of the incidents that I mentioned might have caused it or might have aggravated it."

The burden was on plaintiff to prove that his impaired physical condition arose out of and in the course of his employment. *Trumble* v. *Michigan State Police, supra.* To so find under the record before us, as the commission found, would clearly be a mere guess—a matter of conjecture and speculation.

The award of the commission is vacated and the case remanded for entry of an order in conformity herewith.

BOYLES, C. J., and REID, DETHMERS, BUTZEL, CARR, BUSHNELL, and SHARPE, JJ., concurred.