COLLINS v. COLLINS.

DIVORCE—EXTREME CRUELTY—ALIMONY.

*Held*, in a suit for divorce, that the complainant's testimony showing cruelty of her husband sustained the granting of a divorce, and that an award of alimony of $4,000 worth of realty, out of property worth $11,000, and $800 cash, with a solicitor's fee of $150, was not excessive.

Appeal from Van Buren; Des Voignes, J. Submitted October 19, 1915. (Docket No. 161.) Decided December 22, 1915.

Bill by Jennie Collins against William H. Collins for divorce. From a decree for complainant, defendant appeals. Affirmed.

*James E. Chandler*, for complainant.

*W. J. Barnard*, for defendant.

MOORE, J. From a decree of divorce with alimony in favor of the complainant, an appeal is taken to this court by the defendant. Defendant claims:

(1) There was no ground for divorce; and (2) that, if there was, the amount of alimony is excessive.

In his oral opinion the trial judge described the condition of the plaintiff as follows:

"She is now an invalid. She is afflicted with a rheumatic trouble wherein her arms are crippled. Her limbs or lower extremities are drawn back. She cannot raise her body on her feet. She is brought in this courtroom in a wheel chair, an invalid's chair; and that has not been done for effect. Any one looking at her hands can see their shriveled condition and all that. Outside of that she is a woman in apparently fair health."

The parties were married in October, 1874, and lived together until September, 1912, when complainant says she was afraid to live with defendant any longer. The complainant bore to the defendant nine children, eight of whom were living at the time of the trial. At the time of the marriage neither of them had any property. They began married life in one room. The defendant had employment in a rolling mill. Later they moved to South Chicago, where defendant was employed in the steel mills until 1909 or 1910. In 1911 he began to draw a pension of $81.25 a month from the steel company which it is expected will continue during life. In 1910 defendant bought 8 acres of land on the shore of a lake in Van Buren county, and built a house on it, at a cost of $3,500, which has been used as a home and a summer resort. Later 40 acres in the same township was bought at a cost of $1,000. The parties were hard-working, frugal people, and seem to have prospered financially and to get along very well together until after they moved to Van Buren county, although before that it is claimed defendant sometimes drank too heavily. Nearly ten years ago the plaintiff became an invalid, and was obliged to be lifted up and down and got about in a wheel chair. It is her claim that after they came to Van Buren county defendant tired of her and became enamored of one Jennie McDonald, and that his relations with her had become the subject of common talk. She testified in part as follows:

"I heard he was making visits to Mrs. McDonald. He was there pretty nearly all of the time they told me. I went to Chicago. I was sick the winter before, and went to Chicago to doctor, and while I was gone to Chicago she stayed in my house, her and her two children, with him, and her horse and cow was there. Mrs. McDonald stayed at my house; yes, sir. I know it because my daughter was there who was only a little over 17 at that time. * * *

"*Q.* During the time that you were living at Grand Junction on the place did your daughter Marie ever tell you anything that she had observed between your husband and Mrs. McDonald?

"*A.* Yes; she did tell me. I discussed the matter with my husband. Just before I left I told him about it. He had her in South Chicago for a week, too, across the lake. At the time I talked this matter over with my husband there was present of my children Stella and my son James and my husband. He was going to murder us, shoot us. I told him what he had been doing, and he had been with her all the time. And he wanted to know if I had proof of it, and I told him I did. I told him about being in the city with her, and he wanted me to name one, and I told him what Marie said. 'Your own daughter had seen things.' And he said, 'Well, she did, did she?' 'Why,' I says, 'You have got to leave Mrs. McDonald alone and keep away from her, or I can't live with you.' He says he will 'leave both of us,' he says; 'but,' he says, 'before I go, I will shoot the top of the head of John, the top of John's head off.' He has threatened me time and again, too. On the occasion of those threats he said he would get rid of us. He said he would come Bob on us; that is his brother. And his brother shot his wife and shot himself in Detroit. My husband had a shotgun—no revolver. The next day he went and got a revolver. * * * After he got in thick with her he went upstairs to sleep, and he would make out he was going to bed, and I would see him take his hat and coat and shoes after he took them off in the dining room and carry them in the front hall and leave them there, and get up and go out, because we have got up and seen him he wasn't in bed. That happened quite a few times. * * * His threats of violence towards me and other members of the family caused me to leave in dread and fear. I was always afraid of him since we come to the country here. Since he got in with her I was always afraid of him. I left the 7th of September, 1912. The next year I come back to Grand Junction and lived there during the summer; kept boarders.

"*Q.* Where was your husband at that time?

"*A.* Well, I heard he was down South; and she was with him, I heard.

"*Mr. Barnard:* I object to that, about her being with him down South.

"Q. Was she there about Grand Junction?

"A. No; she was gone the biggest part of the time. * * * I have been a wife to him right along. He didn't have to go, notwithstanding my ailment. Mrs. McDonald went to my house, and her daughter, and he pulled out a roll of money, and was counting it out, you know, and he stuck that under my nose and says, 'Smell that; that is your share of it.' And it was my share, too. They were getting all of his money. That was in the spring before I left in 1912. It was after getting his pension and getting the interest, you know, and he had all that money together, and he was showing what he had, and he rolled it up and stuck it under my nose and said, 'Smell that; that is your share of it.' John and Stella was there, Mrs. McDonald and her daughter."

She also testified to other threats.

One of his daughters testified in part:

"I heard my father say his brother Bob could use the gun, and he could, too. He would clean out the bunch of us. Robert was the man who killed his wife and himself in Detroit. By that I understood my father was going to shoot up the crowd there. At that time Stella, my sister, Jim and I and mother and a few resorters were there. That was the fall that mother left. I never had heard him make any threats before that. The day we left he went to Kalamazoo. The day that we were afraid of him he said he was going to get what he called heavy artillery, and mother was afraid, so that is the day we left. The night before we left he was up all night and searched around, and didn't go to bed at all. I heard him say he was going to get rid of three or four. My mother was talking with him about his intimacy with Mrs. McDonald, and told him about what Marie had seen; that Marie had reported that she had seen him coming out of the barn together. Ma told Daddy that the night before she left, and he says: 'You should not believe what a child says; you have got the child scared into saying that.' That is the time he made threats and kicked the chairs around. My sister Stella, my brother James,

and some resorters were there at that time. John took mother away at that time, and the rest of us all went. We took her away because of the threats that had been made there and what had happened, because we were afraid to leave her there. She wanted to go. She said she was afraid."

A grandson testified, in substance, that while he was at work in South Haven he saw the defendant come off the Chicago boat.

"I saw Mr. Collins and Mrs. McDonald go from the boat dock towards the Michigan Central depot, and Mr. Collins was carrying two grips."

A daughter testified:

"In August, 1912, I remember my father being in Chicago about a week. He said he was going to Chicago. Mother asked him. He said he was going for a good time. I heard afterwards from Harvey Collins that my father and Mrs. McDonald had been seen together on the streets of South Haven, and that was the time of his return from his week's absence. Yes."

A daughter testified:

"I lived with my father and mother at Grand Junction. I know my father used to stop at Mrs. McDonald's quite often, and when he took us to town he would go and buy groceries to the store and take them in to her, and I never saw him take any change from her there."

Another witness testified he had seen defendant at the McDonald premises several times, and that defendant paid him for chickens which by the order of defendant he delivered to Mrs. McDonald.

Another witness testified that after Mrs. Collins went away he saw Mrs. McDonald and defendant go towards the Collins place four or five times, that they would be gone a half hour or longer, and that he had seen defendant at Mrs. McDonald's place a number of times.

A paper was produced in the handwriting of defendant addressed to his brother, in which, after making reference to his family troubles, the following occurred:

"Now, I have not written this to cover up any of my shortcomings, but will say that my Creator has given me passion that may have led me along paths I should not go, but, if I did not have an invalid wife, I might not have wandered away along strange paths."

At the close of the testimony offered on the part of complainant counsel for defendant said: "I don't care to introduce any defense."

When the judge was delivering an oral opinion indicating what he intended to do, counsel said:

"I want it to appear on this record now that the answer denies any stock in the United States Steel Corporation, and we offered, if the court thought we owned any stock, to make a decree giving her part of it, and that we also offered to have all the property sold and equally divided."

We think the court was justified in granting a decree of divorce. *Briggs* v. *Briggs*, 20 Mich. 34; *Palmer* v. *Palmer*, 45 Mich. 150 (7 N. W. 760, 40 Am. Rep. 461); *Nicholas* v. *Nicholas*, 50 Mich. 162 (15 N. W. 64); *Hoyt* v. *Hoyt*, 56 Mich. 50 (22 N. W. 105); *Bailey* v. *Bailey*, 121 Mich. 236 (80 N. W. 32).

We now come to a more troublesome branch of the case, and that is the question of alimony. We have already shown the physical condition of the complainant and that defendant is assured a monthly pension of $81.25, presumably during life. The bill of complaint charges that defendant owns the Saddle Lake property, worth, with the buildings upon it, $4,000, and 40 acres of land worth $1,000, two lots on Avenue L, Chicago, worth $4,000, and three lots on Ewing avenue worth $3,000, and $4,000 of stock of the Illinois Steel Company. The answer avers he has turned

over two lots to complainant worth $3,000, admits the property on Avenue L is worth $3,000, and admits the Van Buren county real estate is worth $4,000. He denies he owns any steel stock. This denial is not under oath.

The complainant testified that defendant had not turned over to her any real estate, and that she wanted the Van Buren county property as a home, and also because, with the assistance of her son, she could earn with it a living. She also testified to the ownership of the steel stock by defendant, and that as late as in 1912 she knew of the defendant drawing dividends on the steel company stock.

In September, 1910, the South Chicago Savings Bank wrote defendant acknowledging the payment of a $2,000 note, the letter closing:

"We hold collateral consisting of 35 shares United States Steel Corporation Pfd. stock subject to your order."

. November 8, 1911, defendant made another loan at the same bank, and pledged 35 shares United States Steel Company's stock as collateral, and this note was paid February 5, 1912. While defendant made in his unsworn answer a denial of owning this stock, he did not come into court and tell the judge when and for what price he sold it.

Under all the circumstances shown by this record we think we will not disturb the decree awarding the complainant the Van Buren county property, including the equipment of the summer resort property, alimony in the sum of $800, and a solicitor's fee of $150.

It is affirmed, with costs.

BROOKE, C. J., and PERSON, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.