KROPF *v.* MICHIGAN BEAN CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—INDUSTRIAL ACCIDENT BOARD—INFERENCES TO BE DRAWN FROM ESTABLISHED FACTS.

In proceedings under the workmen's compensation law, it is the province of the industrial accident board to draw the legitimate inferences and weigh the probabilities from the established facts.

2. SAME—FINDING OF BOARD—CONCLUSIVENESS.

On certiorari to review an award of the industrial accident board under the workmen's compensation law, where the finding of the board that plaintiff's husband, a nightwatchman in defendant's warehouse and dock on the banks of the St. Clair river, who disappeared one night and whose body was later found in the river, was accidentally drowned while in the course of his employment, was justified by some of the established facts, the award will be affirmed.

Certiorari to Industrial Accident Board. Submitted June 11, 1920. (Docket No. 64.) Decided September 30, 1920.

Barbara Kropf presented her claim for compensation against the Michigan Bean Company for the accidental death of her husband in defendant's employ. From an order awarding compensation, defendant and the Southern Surety Company, insurer, bring certiorari. Affirmed.

*Clark C. Coulter,* for appellants.

*Burt D. Cady,* for appellee.

MOORE, C. J. The Michigan Bean Company on March 17, 1919, had a warehouse and long dock on the banks of the St. Clair river at Port Huron. Jacob

On conclusiveness of findings as to what constitutes an accident or injury, within the meaning of workmen's compensation acts, see note in L. R. A. 1918F, 877.

Kropf had been employed by the Michigan Bean Company as a nightwatchman and janitor for about 3½ years prior to March 17, 1919. On March 17, 1919, the foreman for the company upon coming to work about 6:30 a. m. found the lights about the plant still burning and Jacob Kropf had disappeared. He had punched his watchman's clock at about 4:40 or 4:50 a. m., and had placed the clock in its usual place in the office of the Michigan Bean Company. April 30, 1919, Mr. Kropf's body was found in the river two miles below defendant's dock. A claim was made by plaintiff and an award was made in her favor. This proceeding is certiorari to review that award. It is conceded that, if there is any liability, the award should not be disturbed.

The claim of the appellants is tersely stated in a brief by their counsel as follows:

"There is no evidence in the record which would warrant a finding that his death was in any manner due to an accidental personal injury received in the course of his employment; that there is no evidence in the record which would indicate an accidental personal injury arising out of his employment, that the manner in which he came to his death is a matter of conjecture only; that the facts which are proved upon the record are as consistent with the non-liability of the defendants under the compensation act as with the liability, that the only conclusion that can be legitimately drawn from the evidence is that the man was fishing at the time he fell into the river.   *   *   *

"The attention of this honorable court is invited to the fact that snagging herring is an active process, involving the jerking up through a school of herring of a line to which are attached a number of hooks; that a man to do this ordinarily would stand upon his feet and would move rapidly. It is the defendants' theory that the deceased, at the time he fell into the river, had snagged some herring on his hooks and, as is quite usual, doubting whether his pole was strong enough to lift the fish to the dock, reached over and seized the fish line below the end of the pole in his

hand for the purpose of lifting his catch to the dock. It is believed by the defendants that in this act he lost his balance and fell into the river, and it is submitted that this is a highly feasible explanation; certainly much more feasible than that the deceased went to the edge of the dock to empty a pail of dirt with a fish pole in his hand (the pail being later found sitting upright several feet from the edge of the dock), or that he went out on the dock to perform some unknown duty, carrying a fish pole in his hand for some unknown reason."

Counsel cites in support of his contention *Ginsberg* v. *Adding Machine Co.*, 204 Mich. 130; *Chaudier* v. *Lumber Co.*, 206 Mich. 433, and other Michigan cases.

It may be well here to call attention to what is said in the return of the industrial accident board. We quote part of it:

"The decedent's work as nightwatchman called him on duty at 7 p. m. and relieved him from duty at 5:30 a. m. His duties during this time were to clean up the office, warehouse and elevator, keep up the fires in furnaces, and make the rounds of ten or twelve watch stations once each hour, ringing up the hours on his watchman's clock with the keys placed at the respective stations.

"On the morning of March 17, 1919, he rang up his last station as required on the clock, between 4:40 and 4:50. From that time nothing was known of him until his body was found floating in St. Clair river, a considerable distance down the river from the dock of the Michigan Bean Company.

"On the night and morning of March 17, 1919, there was a very dense fog on the river, making the dock very wet and slippery and objects not discernible, even at a distance of two feet away.

"When the body of decedent was recovered on April 30, 1919, it was found his watch had stopped at 4:58 o'clock, about eight minutes after the last station was recorded on the watch clock.

"It was one of his last duties to turn off the lights on the dock and outside of the buildings. These were controlled by a switch located in the office of the D. &

C. Boat Company, a few feet away from the edge of the dock, which lights were found to be on when the workmen arrived at the Michigan Bean Company on the morning of March 17, 1919.

"The habits of the decedent were exemplary and he was painstaking and industrious in the discharge of his duty.

"To sustain their contention that the accident did not arise out of and in the course of the employment of the deceased, the respondents rely upon the theory that the decedent had left his employ and was fishing off the dock, when he met his death.

"It appears from the proofs that after the decedent was missed, his overcoat, undercoat, glasses and several small herring wrapped up in a newspaper were found on a table in the office; that a pail which the decedent was accustomed to using about his work was found standing near the edge of the dock a short distance from one of the stations to which it was necessary for this decedent in the course of his employment to go.    *    *    *

"The respondent (decedent) was missed early on the morning of March 17, 1919. He was last seen while performing his duties upon the premises of the respondent. On April 30th following his body was taken from the river some distance below the respondent's premises. When the body was recovered a jointed bamboo fish pole was attached to the body. A line connected to the pole being wrapped around the decedent's arm. Some witnesses testify this pole is the previously mentioned pole which had been kept about the premises. There seems to have been no identification marks about this pole by which the witnesses would be able to distinguish it other than a piece of bag string which had been used to fasten it together at the joint so that a section might not be lost in case the pole came apart. There is considerable testimony in the record to the effect that many jointed bamboo poles were sold and used in this vicinity of the same make and appearance as the pole in question and that it was not unusual for such poles to be tied together at the joints for the purpose of preventing the loss of a section.

"The body when recovered had on overalls and

smock of the deceased which he wore when about his work.

"The fish which were found wrapped up in a paper upon careful inspection by a number of witnesses showed that they had no wound upon them as they would have had if they had been caught with a hook in the manner which herring are caught. It appears by the testimony that herring are caught either in a seine or net, or by what is known as snagging. It appears by the proofs that if these fish had been caught by snagging or with a hook as the respondents contend they would have been wounded.

"It appears by the proofs that many of the witnesses saw a pail standing near the edge of the dock and one witness connected with the respondent company claims to have seen fish scales in it. None of the other witnesses noticed the fish scales. The fish found upon the table had not been scaled. The decedent had frequently purchased fish from fishermen who fished about this dock and others. Although he had worked about this dock in the neighborhood of three years and many of the witnesses had been well acquainted with him and about the docks a great deal, none of them had ever seen him fish. There is testimony to the effect that he was afraid of the water.

"He disappeared very early on Monday morning. Testimony shows that he had conscientious scruples against working on Sunday and that on Sunday nights he did all his work after twelve o'clock. His duties were that of a nightwatchman and in addition it was his duty to keep up the fires and do a considerable amount of janitor work. There were a number of stations upon the premises and it was his duty to make rounds of each station and punch a clock every hour. One station was about ten feet from the edge of the dock and in passing to and from this station it was necessary to be within seven or eight feet from the edge of the dock. There was an unusually dense fog upon the morning in question. Testimony shows that the fog was so dense that a lantern would be of little or no use, it being the custom of decedent to carry a lantern. The decedent had made his rounds and punched the clock between 4:40 and 4:50. The watch which he carried and which was recovered with

his body had stopped at 4:58. The lights were found burning when employees reached the premises at about 6 o'clock. It was one of the last duties of the decedent to turn off these lights. To perform this duty he would pass near the edge of the dock. * * *

"It appears from the proofs that fishermen in this vicinity did not fish during a dense fog. It further appears that the decedent was a faithful and conscientious employee. The temperature upon the night in question according to the witnesses was about such as is usual at this season of the year. If a man were to indulge in fishing under these conditions it would not seem that he would stay out in the cold and dampness clad as decedent was with his heavy clothing laying in the office.

"It would seem clear that the fish found in the office had not been caught by the decedent and must have been purchased from some one as the decedent was accustomed to purchase fish from others.

"It appears that the pail upon the dock was one which the decedent was in the custom of using to carry sweepings from the office for the purpose of throwing them into the river. From the time that decedent punched the clock in the course of his duties and the time that his watch appears to have stopped he must have fallen into the water almost immediately after punching the clock, as the watch probably would not stop instantly upon entering the water. The dock was slippery, and the darkness was extreme. It would not be unusual for the decedent in making his rounds to become confused and take a step or two out of his usual course; it would not be unusual for him to fall from a slippery dock or accidentally step into the water. It would be unusual for a man 51 years of age who had worked about the same dock for three years and never indulged in fishing to choose a cold, foggy, chilly, disagreeable morning to indulge himself in this pastime, especially without protecting himself with heavy clothing which he had at hand.

"We therefore find that the applicant's decedent fell from the dock and was drowned while engaged in the performance of his duties as an employee of the respondent Michigan Bean Company and that the accident arose out of and in the course of his employment."

The manager of defendant company on cross-examination testified in part:

"*Q.* How long had Mr. Kropf been working for you?

"*A.* I couldn't just tell you because I haven't had the records to fall back on, but about two years, I imagine.

"*Q.* You always found him an efficient employee?

"*A.* Mr. Kropf was one of the finest I ever knew; he was methodical and capable and kept things up in good shape.

"*Q.* Very painstaking?

"*A.* Yes, and I am sure that he would not diverge one step from the path of duty until his duties were performed.

"*Q.* You have always found him very careful in that respect?

"*A.* Yes, sir.

"*Q.* And he always followed instructions?

"*A.* Yes, sir.  *  *  *

"*Q.* You say there were some lights in the warehouse burning?

"*A.* On the warehouse.

"*Q.* That is on the outside?

"*A.* Yes, we kept our electric lights there.

"*Q.* It was his duty to turn those lights out?

"*A.* Yes, sir.

"*Q.* What were the hours he was supposed to report? What hours did he leave?

"*A.* Those hours varied.

"*Q.* He had regular hours?

"*A.* Yes.   On Sunday night we gave him an hour so he could attend church services, if he desired; probably around 8:30 he would report.

"*Q.* What time was he supposed to quit?

"*A.* 5:30 in the morning."

The foreman of the Michigan Bean Company testified that he saw herring fish scales in the pail he saw on the dock. The fish that had been wrapped up by Mr. Kropf were taken to his house and the testimony is that they had not been scaled and that they had no wounds such as would have existed if they had been snagged.

The coroner who assisted in removing the body from the water testified in part:

"*Q.* Did you or did you not find that a fishing pole was with this body?

"*A.* I did.

"*Q.* Was this fishing pole in any manner fastened to the body?

"*A.* No, the fish line was around his arm.

"*Q.* Which arm?

"*A.* If I remember right it was the right arm, and the pole was dragging from it.

"*Q.* The pole was attached to the fish line and the fish line was around the deceased's right arm?

"*A.* Yes, sir."     *     *     *

Cross-examination by Mr. Cady:

"*Q.* Was there any hook on the line?

"*A.* Not that I remember of, if there had been a hook I think I would have remembered it.

"*Q.* It was a small line around his arm?

"*A.* Around his arm.

"*Q.* Did you know whether there was more than one twist of the line?

"*A.* No, I think there was just one twist around the arm."

Much stress is put upon the testimony of Willard. Smith, a young man about 15 years old, whose evidence tended to identify the fish pole as one he had used. His attention was called to the pole shortly before the trial and he examined it; we quote:

"*Q.* Did you recognize that fish pole as the same fish pole which you had used and which had disappeared at the time of Mr. Kropf's disappearance?

"*A.* Yes, sir.

"*Q.* How did you recognize it as the same pole?

"*A.* I recognized where I had tied it together with bag twine.

"*Q.* That is when you used this pole you had repaired it with bag twine?

"*A.* Yes, sir.

"*Q.* Is that the pole which Mr. Falk has in his hands?

(Witness examined pole.)   *"A.* Yes, sir.

*"Q.* Is that the twine on there that you put on there yourself?

*"A.* It is.

*"Q.* And you are absolutely certain that is the same pole you had used?

*"A.* Yes, sir.

*"Q.* And that disappeared?

*"A.* Yes."

On the cross-examination he testified in part:

*"Q.* When did you see this pole last before March 17, 1919?

*"A.* About three or four weeks before.

*"Q.* What were you using it for?

*"A.* To catch fish.

*"Q.* What kind of fish?

*"A.* Herring.

*"Q.* How were you catching them?

*"A.* Hooking them.

*"Q.* Snagging them?

*"A.* Yes, sir.

*"Q.* How many hooks were on the line?

*"A.* There was four, I think.

*"Q.* Four grapples?

*"A.* Yes, sir.

*"Q.* How many hooks on each grapple?

*"A.* Three

*"Q.* Was there a sinker on it?

*"A.* Yes, I think so.

*"Q.* Were there any grapples or hooks or sinkers on this line when you saw it over at Falk's rooms?

*"A.* No, sir.   *   *   *

*"Q.* You used it twice, is that the times?

*"A.* Yes, sir.   *   *   *

*"Q.* And one of those occasions was about four weeks before March 17th and the other about three weeks before March 17th; is that correct?

*"A.* Yes, sir.   *   *   *

*"Q.* Is there anything about this pole other than the string that makes you identify it as the pole that was down there?

*"A.* No."

There was much testimony that many poles were

used along the dock which were jointed poles, the joints of which were connected with a string in a manner similar to that described by Willard Smith, and that some of these poles were lost in the river.

The testimony is very clear that a fish pole when last seen at defendant's dock had attached to it a line to which there was attached grapples to each of which were attached hooks. It is equally clear that the line wound around the arm of deceased when he was found had neither grapples nor hooks.

We have recited very little of the testimony. That portion recited in the award is to be found in the voluminous record. We have not referred, except as quoting from the award, to that relating to the cold March morning on the St. Clair river, and the fact that the deceased's thick clothing was left in the office, nor the fact that the fog was so dense as to be almost impenetrable, making the dock wet and slippery, and its outlines invisible. It has already appeared in what we have quoted that Mr. Kropf disappeared with some of his work undone and if any inference is to be drawn from the time when his watch stopped he disappeared before quitting time had arrived.

In the case of *Ginsberg* v. *Adding Machine Co.*, *supra*, we do not understand that any new rule of evidence was announced in the majority opinion. We quote from it:

"The burden of establishing a claim for compensation rests on those seeking the award. They are not required to establish their case by positive, direct evidence; in many cases that would be impossible; they may prove their case by circumstantial evidence as other cases are established. The board is the trier of the facts, and weighs and measures the conflicting testimony, medical as well as lay. *Deem* v. *Kalamazoo Paper Co.*, 189 Mich. 665; *Perdew* v. *Nufer Cedar Co.*, 201 Mich. 520. It is the province of the board to draw the legitimate inferences from the established facts and to weigh the probabilities from such established

facts. *Wilson* v. *Phœnix Furniture Co.*, 201 Mich. 531."

In that case five of the Justices were of the opinion that the established facts did not warrant an inference that would establish claimant's case, while three of the Justices were of the opinion that the inference might be fairly drawn from the record. The situation in *Chaudier* v. *Lumber Co.*, *supra*, was practically the same.

· In the instant case we think the conclusions of the industrial accident board are justified by some of the established facts. See *De Mann* v. *Engineering Co.*, 192 Mich. 594; *Perdew* v. *Nufer Cedar Co.*, 201 Mich. 520; *Wilson* v. *Phœnix Furniture Co.*, 201 Mich. 531.

The award is affirmed, with costs to the claimant.

STEERE, BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.